## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**ROBERT HENRY ELZY, JR.**                    **CIVIL ACTION**

**versus**                                                            **NO. 14-229**

**ROBERT TANNER, WARDEN**                **SECTION: "E" (3)**

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts. Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing. See 28 U.S.C. § 2254(e)(2). Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Robert Henry Elzy, Jr., is a state prisoner incarcerated at the B.B. "Sixty" Rayburn Correctional Center in Angie, Louisiana. On August 5, 2009, he was convicted of forcible

rape under Louisiana law.[1]  On September 8, 2009, he was sentenced to a term of thirteen years imprisonment, and it was ordered that the first five years of that sentence be served without benefit of probation, parole, or suspension of sentence.[2]  On May 7, 2010, the Louisiana First Circuit Court of Appeal affirmed his conviction and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on February 18, 2011.[4]

On August 26, 2011, petitioner, through counsel, filed an application for post-conviction relief with the state district court.[5]  On March 23, 2012, that application was denied.[6]  His related writ applications were then denied by the Louisiana First Circuit Court of Appeal on August 13, 2012,[7] and by the Louisiana Supreme Court on May 31, 2013.[8]

---

[1] State Rec., Vol. I of II, trial transcript, p. 296.

[2] State Rec., Vol. I of II, transcript of September 8, 2009.

[3] State v. Elzy, No. 2009 KA 2263, 2010 WL 1838321 (La. App. 1st Cir. May 7, 2010); State Rec., Vol. I of II.

[4] State v. Elzy, 57 So.3d 328 (La. 2011); State Rec., Vol. I of II.

[5] State Rec., Vol. II of II.

[6] State Rec., Vol. I of II, Order dated March 23, 2009.

[7] State v. Elzy, No. 2012 KW 0993 (La. App. 1st Cir. Aug. 13, 2012); State Rec., Vol. I of II.

[8] State v. Elzy, 118 So.3d 386 (La. 2013); State Rec., Vol. I of II.

Petitioner, through counsel, thereafter filed the instant federal application for *habeas corpus* relief.[9]  The state then filed a response conceding that the application is timely but arguing that relief should be denied on the merits,[10] and petitioner filed a reply to the state's response.[11]

Facts

On direct appeal, the Louisiana First Circuit Court of Appeal summarized the facts of this case as follows:

> Mark Anthony Spears was originally charged as a co-defendant in the present case.  Prior to trial, Spears entered a guilty plea to the charge of forcible rape, in exchange for a sentencing recommendation for a sentence of seven to ten years.  Pursuant to this plea agreement, Spears would testify against defendant.  Spears admitted he had three prior felony convictions, including a 1991 conviction for forcible rape involving his girlfriend's sister.
>
> Spears, who was forty-three years old at the time of trial, first met defendant when he was a student at Independence Junior High and defendant was a teacher and coach.  Since then, Spears and defendant had maintained a friendship.  In 2001, J.M. met defendant and shortly thereafter they began a romantic relationship, and eventually discussed getting married.
>
> According to Spears, on May 30, 2003, defendant contacted him with an invitation to "party" and brought up the prospect of Spears engaging in sexual relations with J.M.  Spears had met J.M. previously and knew she was in a relationship with defendant.  Spears agreed to go out with defendant and J.M., and they picked him up in the earlier part of the evening.  J.M. initially objected to having Spears around on this particular evening, but defendant insisted, so she agreed.[FN2]

---

[9] Rec. Doc. 1.

[10]  Rec. Doc. 10.

[11]  Rec. Doc. 14.

[FN2]  At trial, J.M. explained that she was fearful of Spears and described how the first time she met him, she was with defendant and they had picked up Spears.  According to J.M., defendant told Spears to drive the vehicle while he and J.M. rode in the backseat.  J.M. stated this gave her a "fishy" feeling, so she phoned her sister and talked to her while they drove around.  J.M. said the next two times she was around Spears, it was at defendant's residence.  While Spears was there, J.M. noticed that, once, the phone in the master bedroom had been taken off the receiver; and another time, the phone line had been unplugged from the receiver and run through the computer.

The group initially went to a club in Tangipahoa, but because it was a small crowd, they proceeded to a different club in Hammond known as Pajo's.  Spears was the only one who entered the club, apparently just long enough to drink one beer.  When he returned to defendant's vehicle, Spears claims defendant and J.M. were having sex in the vehicle.[FN3]  Spears briefly returned to the club, then went outside again.

[FN3]  During her testimony, J.M. denied she and defendant engaged in sexual activity while in the vehicle in the parking lot.  Rather, J.M. stated they argued and then she fell asleep.

After the group left Pajo's, they all returned to defendant's residence in Ponchatoula.  J.M. was not aware defendant intended for Spears to spend the night at his residence until he told J.M. not to drive Spears home.  Inside the residence, there was an air mattress on the floor in the living room.  According to Spears, they had a few drinks in the living room, and then J.M. went to the bathroom to get sheets for the air mattress.

At trial, Spears explained that defendant told him he wanted Spears to have sex with J.M. "by all means necessary."  Spears stated that defendant told him even if J.M. refused, he was to go on because it was "all about control."  According to Spears, defendant would be present during the incident, but would be pretending to be asleep.  Thus, when J.M. was in the bathroom, defendant directed Spears to

- 4 -

follow her and bring her out and have sex with her, in front of where he was sitting on the sofa.

Spears walked over to the spare bathroom near the kitchen, grabbed J.M., and an altercation ensued. J.M. and Spears struggled, and Spears forced J.M. out into the living room, where Spears raped J.M.    According to Spears, defendant was in the living room pretending to be asleep; however, J.M. testified she thought defendant had gone into their bedroom. J.M. stated the door to their bedroom was open, but she was unsure if defendant watched the rape. Spears testified that he told J.M. that defendant would not help her and that defendant wanted this to happen.

After the rape, J.M got up to go to the bathroom. As J.M. entered the master bedroom, she began striking defendant and accusing him of setting her up. Defendant responded to J.M.'s attempts to awaken him, and he woke up and stated he had done nothing to her. J.M. went into the master bathroom where she pretended to douche. According to J.M., defendant watched her in the bathroom and failed to exhibit any concern for her given what she had told him had occurred.

Spears testified that following the rape, J.M. appeared "strange" and that he told defendant they were "going to have a problem." J.M. began arguing with defendant, and defendant stated, "I'll kill that bitch." While defendant and J.M. continued to argue, Spears left the residence on foot.

J.M. testified the argument between her and defendant turned physical and she pulled a knife on him and stabbed him in the leg. J.M. stated she realized she could not overpower defendant so she "quit" and told him to beat her. At that point, defendant began to hug and console her and told J.M., "Remember we both work for the school system." However, J.M. resumed arguing with defendant over his role in her rape, and defendant told her, "You know you wanted to be turned out."

As the morning wore on, J.M. realized she would not be able to get away from defendant as long as she argued and fought, so she decided she would act like nothing happened. Since they had planned to do some painting at her residence, J.M. told defendant she wanted to go home and paint. Because she could not find her cell phone, she asked defendant if she could use his phone to call her house. J.M. called her house and told her son to stay there until she arrived with the paint.

Defendant and J.M. went to Sears and bought paint. Defendant then drove J.M. back to his house to get her cell phone.

- 5 -

When they arrived, J.M. refused to get out of defendant's vehicle and said he could bring her the phone. Defendant then told J.M. she needed to change her clothing. J.M. refused, so defendant stayed in his vehicle and began driving to New Orleans. J.M. then agreed she would get out at his residence and go inside and change clothes, so defendant turned around and drove back to his house. When they arrived at his residence, J.M. jumped from the vehicle and began walking toward a neighbor's house.

As J.M. exited defendant's vehicle, defendant commented, "It's going to be like that." J.M. simply replied, "Yeah," as she proceeded to the neighbor's house and asked to use the phone. J.M. called her sister to pick her up, but did not tell any of the neighbors what had occurred. When her sister arrived and drove away, J.M. asked her to take her to North Oaks Hospital where she reported the rape.

At North Oaks Hospital, J.M. was examined by Bernadine Milton, a registered nurse with training in sexual assaults. Milton completed the sexual assault evidence gathering. At trial, the parties stipulated that the vaginal swab contained a DNA profile that matched the DNA of Spears.

Officer John Cieutat, of the Ponchatoula Police Department, was dispatched to the hospital in response to J.M.'s complaint that she had been raped. In her statement to Officer Cieutat, J.M. identified Spears as the rapist and defendant as being in the house and allowing the rape to occur. J.M. also told Officer Cieutat that she had gone to Sears with defendant earlier that day in an attempt to stop the fighting between them and that defendant had earlier grabbed the clothing she wore the previous night from the air mattress and threw it in the washing machine.

Detective Christy Varnado of the Ponchatouia Police Department also spoke with J.M. Based on her interview with J.M., Detective Varnado obtained a search warrant of defendant's residence at Southeast Railroad Avenue. In executing the search warrant at 6:09 p.m., Detective Varnado observed in the spare bathroom there appeared to be evidence that a towel rack had been removed, and there was a hook where a shower curtain may have been. Detective Varnado also noted fragments of blue glass on a shelf in the bathroom. Detective Varnado noticed there were pieces of the same type of blue glass in the trash can. There also was evidence that the bathroom door had been forced open. Detective Varnado also seized the clothing J.M. described she had been wearing the previous night and sheets from the dryer in defendant's residence.

J.M. went on to testify that despite her feelings that defendant had been involved in allowing Spears to rape her, she attempted reconciliation with him.  Several weeks following her rape, J.M. contacted defendant regarding money he owed her.  J.M. explained she was still in love with defendant and they wound up meeting at a hotel, where they seemingly worked out their problems, with defendant indicating he wanted to marry her.  J.M. wound up having sexual intercourse with defendant that night; however, J.M. later realized the relationship would not last given what had occurred.  J.M. testified that she had always felt sexually inadequate in their relationship because defendant wanted her to do things she was not comfortable doing.

Following his arrest, Spears did not tell the police defendant had taken any action to facilitate Spears's rape of J.M.  It was only after the State entered plea negotiations with Spears that Spears revealed he and defendant had previously engaged in this type of arrangement.  According to Spears, in 1996, defendant had Spears over to his residence for the purpose of raping defendant's then-wife, C.G.  Spears testified that in April 1996, similar to the present incident, defendant called him and invited him to "party" and discussed Spears having sex with C.G. and how defendant wanted to watch Spears force himself on his wife.  According to Spears, he went to defendant's house and after a few drinks, defendant encouraged Spears to "pursue" C.G., who had just gone into the bedroom.  Spears claimed he went into the bedroom, began struggling with C.G., and that defendant went into the room to watch as he raped C.G.  According to Spears, defendant did nothing to help C.G., despite her cries, and defendant made her ride with them when he drove Spears home.

Although Spears was arrested for the 1996 incident, the matter was reviewed by a grand jury, which declined to return a true bill.  Defendant was not charged or arrested in connection with the 1996 incident involving C.G.[FN4]

> [FN4]  The State also presented testimony from C.G., who had been married to defendant from July 1995 to April 1996.  C.G. described an incident in 1996, while still married to defendant, wherein he picked up Spears and took him back to their residence.  After Spears and defendant visited and drank beer, she decided to go to bed.  C.G. thought defendant would drive Spears home.  After she went to bed, someone

came into the bed that she initially thought was her husband. However, when she touched him, she realized it was not defendant, but Spears. C.G. screamed for defendant and began fighting with Spears. Spears told C.G. that defendant was passed out drunk and dragged her into the room where defendant appeared to be passed out. C.G. tried to shake defendant awake, but he never responded. Spears dragged C.G. back into the bedroom and raped her. C.G. testified that as she struggled in the bedroom with Spears, she noticed that the gun they usually kept in the bedroom was not there, nor was the alarm switch in its usual location.

After Spears finished raping her, he left the room. About forty-five minutes to an hour later, defendant entered the bedroom and tried to initiate sexual relations. Defendant also asked C.G. why she had locked the door. Although defendant was initially concerned when C.G. told him what had happened, as time wore on, defendant appeared more and more defensive of Spears and vocalized to J.M. [sic] that if she reported this, it would ruin Spears's reputation. As defendant further withdrew his support of C.G. and their relationship crumbled, C.G. left and filed for divorce. Defendant filed a countersuit to the divorce petition claiming C.G. had an affair with Spears. According to C.G., the divorce was bitter and ugly.

At trial, C.G. testified that the day after Spears raped her, it occurred to her that defendant had been involved in her rape. She explained she waited a month before reporting the rape because defendant did not want her to report it, and she only reported it after she filed for divorce. C.G. testified she did not know if defendant watched Spears rape her.

Defendant presented testimony from Jessie Mae Hill, his cousin, who lived next door to him. According to Hill, J.M. came over on May 31, 2003, so she could call her sister. Hill testified that J.M. appeared calm and not upset in any manner. Debbie Brown, defendant's sister, testified she was at Hill's residence on May 31,

2003, engaged in a normal conversation with J.M., and J.M. appeared normal.

Defendant did not testify.[12]

Petitioner's Claims

In his federal application, petitioner asserts claims under both state and federal law.

With respect to state law, he claims that he was not brought to trial within the time limits set forth

in Louisiana Code of Criminal Procedure article 578.[13]  On direct appeal, the Louisiana First Circuit

Court of Appeal denied that claim, holding:

> In the instant case, defendant is charged with one count of forcible rape, a violation of La. R.S. 14:42.1, a non-capital felony. Under La. Code of Crim. P. art. 578(2), defendant's trial was required to commence within two years from the date the prosecution was instituted.  Prosecution of this matter was instituted by the filing of a bill of information on August 20, 2003.  Therefore, the State had until August 20, 2005, to commence the defendant's trial.  As of September 17, 2007, the date defendant moved to quash the bill of information, a trial had not been commenced.  Clearly, the two-year prescriptive period for the commencement of trial was exceeded; thus, on its face, the defendant's motion to quash had merit.
>
> Once an accused shows that the State failed to bring him to trial within the time periods specified by Article 578, the State bears a heavy burden of showing that an interruption or suspension of the time limit tolled the running of the two-year period.  State v. Cotton, 2001-1781, pp. 4-5 (La.App. 1 Cir. 5/10/02), 818 So.2d 968, 971, writ denied, 2002-1476 (La. 12/13/02), 831 So.2d 982.
>
> Article 578(2) provides that the trial of non-capital felonies must be held within two years from the date of the institution of prosecution.  Institution of prosecution includes the finding of an indictment, or the filing of a bill of information, or affidavit, which is designed to serve as the basis of a trial.  La. Code Crim. P. art.

---

[12]   State v. Elzy, No. 2009 KA 2263, 2010 WL 1838321, at *1-4 (La. App. 1st Cir. May 7, 2010); State Rec., Vol. I of II.

[13]   Rec. Doc. 1, p. 5.

934(7).  Upon expiration of this time limitation, the court shall, on motion of the defendant, dismiss the indictment and there shall be no further prosecution against defendant for that criminal conduct. <u>Cotton</u>, 2001-1781 at 4, 818 So.2d at 971.

An interruption of prescription occurs when the State is unable, through no fault of its own, to try a defendant within the period specified by statute.  Once the cause of the interruption disappears, the time limit begins anew.  <u>See</u> La. Code Crim. P. art. 579(B).  Time limits are suspended when a defendant files a motion to quash or other preliminary plea.  La. Code Crim. P. art. 580. When the prescriptive period is suspended, the relevant period is not counted, and the running of the time limit resumes when the court rules on the motions.  <u>State v. Lathers</u>, 2005-0786, pp. 7-8 (La.App. 1 Cir. 2/10/06), 924 So.2d 1038, 1043, <u>writ denied</u>, 2006-1036 (La. 11/3/06), 940 So.2d 659.

The legislation fixing the time limitations for prosecution serves to establish legislative recognition of the time that the legislature has in all probability found to be a reasonable delay for prosecution.  When the defendant has brought an apparently meritorious motion to quash based on prescription, the State bears a heavy burden to demonstrate either an interruption or a suspension of the time limit such that prescription will not have tolled.  The trial court cannot give the State "the benefit of the doubt" but must require the State to prove suspension or interruption of the time delays if the prosecution takes place beyond the statutory delays.  <u>Lathers</u>, 2005-0786 at 8, 924 So.2d at 1043.

In the present case, it appears that several events occurred to both interrupt and suspend the running of the two-year time limitation.  First, we note that prior to the original two-year deadline of August 20, 2005, the parties agreed to continue trial of this matter from July 11, 2005 to September 12, 2005.  The September 12, 2005 transcript reflects that as of that date, the State was still waiting for results from the Louisiana State Police Crime Lab.  The trial court also made specific note that the law enforcement entities were facing major problems in the aftermath of Hurricane Katrina, thus the trial court set October 5, 2005, as a pre-trial conference date.

The first indication that the crime lab results had been provided to defense counsel was at the October 5, 2005 hearing.  At this hearing, both parties indicated they wanted a trial date.  We note that under Article 579(A)(2), the time limitations are interrupted for any cause beyond the control of the State.  In our opinion, the delay from the State Police Crime Lab is not a cause within the control of

the State; thus, we find once these results were provided to defense counsel, the time limitations began to run anew as provided by Article 579(B).  Thus, the new two-year period to commence trial would run until October 5, 2007.

Within this new two-year period of limitations, the record reflects on June 28, 2006, the State provided an Article 404(B) notice of intent to use other crimes evidence against defendant.  On December 29, 2006, defendant filed a discovery request in connection with this notice by the State.  On that same date, the defense also filed an objection to the State's Notice of Intent to Use Statement of a Co-Conspirator at trial.

Under La. Code Crim. P. art. 580, when a defendant files a motion to quash or other preliminary plea, the running of the periods of limitations established in Article 578 are suspended until the ruling of the court thereon; but in no case shall the State have less than one year after the ruling to commence trial.  For purposes of Article 580, a preliminary plea is any plea or motion filed by the defense that has the effect of delaying trial.  Such pleadings include properly filed motions to quash, motions to suppress, or motions for a continuance, as well as applications for discovery and a bill of particulars.  State v. Allen, 2003-2815, pp. 8-9 (La. 4/23/04), 871 So.2d 1097, 1102.  The record reflects defendant requested a special setting for the December 29, 2006 motions he filed.  However, prior to obtaining a ruling on these pending motions, defendant filed the motion to quash at issue in this assignment of error.  On October 17, 2007, the trial court denied defendant's motion to quash.[FN5]

> [FN5] Defendant sought supervisory writs to this court and obtained a thirty-day stay of the proceedings.  On February 6, 2008, this court denied defendant's writ application.  State v. Elzy, 2007 KW 2286 (La.App. 1 Cir. 2/6/2008) (unpublished).  However, defendant filed a rehearing application with this court and on February 20, 2008, obtained a continuance from the trial court.  On March 3, 2008, this court denied defendant's rehearing application on the trial court's denial of his motion to quash.  State v. Elzy, 2007 KW 2286 (La.App. 1 Cir. 3/8/2008) (unpublished).

We note at this point, defendant's motions regarding the State's use of his prior crimes evidence, which had been filed on December 29, 2006, were still pending before the trial court.

- 11 -

Because this preliminary plea had not been ruled upon, the time period for bringing defendant to trial was suspended. Following the supervisory review of the trial court's denial of defendant's motion to quash, on December 4, 2008, the trial court issued a ruling denying defendant's motion regarding the State's use of prior crimes evidence. According to the minute entry of this date, defendant again obtained a thirty-day stay of the proceedings in which to file a writ application with this court. In a decision dated February 2, 2009, this court denied defendant's writ application. State v. Elzy, 2008 KW 2641 (La.App. 1 Cir. 2/2/2009) (unpublished). The minute entry of February 11, 2009, indicates defendant obtained a continuance in order to seek review of this ruling with the Louisiana Supreme Court. The record reflects the Louisiana Supreme Court denied defendant's writ application. State v. Elzy, 2009-0312 (La. 4/3/09), 6 So.3d 774.

Defendant's trial was commenced on August 3, 2009, less than one year from the denial of his writ application by the supreme court, which falls within the time limits for bringing the matter to trial set forth in Article 580. Accordingly, we cannot say the delay commencing defendant's trial violated the statutory time frame set forth in the Louisiana Code of Criminal Procedure.[14]

The Louisiana Supreme Court then likewise denied relief without assigning reasons.[15]

Petitioner clearly cannot be granted relief under 28 U.S.C. § 2254 based on a claim that he was not brought to trial within the time limits set forth in *state* law. Simply put: federal *habeas corpus* relief is available only to correct violations of *federal* constitutional law and, therefore, this Court does not sit to review alleged errors of *state* law. Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998). Accordingly, a federal *habeas* court will not review a claim that the state courts have misapplied Louisiana Code of Criminal Procedure article 578. Tillman v. Winn Correctional Center, Civ. Action No. 10-cv-1411, 2013 WL 4096910 (W.D. La. Aug. 13, 2013).

---

[14]   State v. Elzy, No. 2009 KA 2263, 2010 WL 1838321, at *4-6 (La. App. 1st Cir. May 7, 2010); State Rec., Vol. I of II.

[15]   State v. Elzy, 57 So.3d 328 (La. 2011); State Rec., Vol. I of II.

Petitioner does, however, additionally assert a cognizable *federal* claim in this proceeding.  Specifically, he claims that he was denied his federal constitutional right to a speedy trial.[16]  On direct appeal, the Louisiana First Circuit Court of Appeal denied petitioner's federal speedy trial claim as well, holding:

> A defendant's right to a speedy trial is a fundamental right imposed on the states by the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Klopfer v. North Carolina, 386 U.S. 213, 222-223, 87 S.Ct. 988, 993, 18 L.Ed.2d 1 (1967).  See also La. Const. art. I, § 16.  The underlying purpose of this constitutional right is to protect a defendant's interests in preventing oppressive pretrial incarceration, limiting possible impairment of his defense, and minimizing his anxiety and concern.  Barker v. Wingo, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 LEd.2d 101 (1972).
>
> In determining whether a defendant's right to a speedy trial has been violated, courts are required to assess the following factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to a speedy trial, and (4) the prejudice to the defendant.  Barker, 407 U.S. at 530, 92 S.Ct. at 2192.  Under the rules established in Barker, none of the four factors listed above is "either a necessary or sufficient condition to the finding of a deprivation of the right to speedy trial."  State v. Love, 2000-3347, p. 15 (La. 5/23/03), 847 So.2d 1198, 1210 (citing Barker, 407 U.S. at 533, 92 S.Ct. at 2193).  Instead, "they are related factors and must be considered together ... in a difficult and sensitive balancing process."  Id.[17]

---

[16]  Rec. Doc. 1, p. 5.

[17]  State v. Elzy, No. 2009 KA 2263, 2010 WL 1838321, at *7 (La. App. 1st Cir. May 7, 2010); State Rec., Vol. I of II.

The Court of Appeal then proceeded to consider all four <u>Barker</u> factors in detail, as explained *infra*, and ultimately concluded that there was no federal speedy trial violation.  The Louisiana Supreme Court thereafter likewise denied relief without assigning additional reasons.[18]

A speedy trial claim presents a mixed question of law and fact.  <u>Divers v. Cain</u>, 698 F.3d 211, 216 (5th Cir. 2012); <u>Amos v. Thornton</u>, 646 F.3d 199, 204 (5th Cir. 2011).  Therefore, to obtain federal relief, petitioner must show that the state court's decision denying his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).

Regarding the "contrary to" clause of § 2254(d)(1), the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

<u>Wooten v. Thaler</u>, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

In the instant case, the state courts identified and applied the controlling United States Supreme Court jurisprudence, i.e. <u>Barker</u>, when considering petitioner's federal speedy trial claim. Moreover, petitioner does not argue that his case presents a "set of facts that are materially

---

[18]  <u>State v. Elzy</u>, 57 So.3d 328 (La. 2011); State Rec., Vol. I of II.

indistinguishable" from a decision of the United States Supreme Court, and, in any event, the undersigned finds that it does not.  Therefore, the state court's decision rejecting his claim cannot be said to be "contrary to" clearly established federal law.

Accordingly, under the AEDPA, this Court must defer to the state court decision unless petitioner shows that the decision constituted an "unreasonable application" of Barker.  See, e.g., Goodrum v. Quarterman, 547 F.3d 249, 257 (5th Cir. 2008) ("Because the state appellate court properly identified the Barker test as the framework for analyzing [petitioner]'s speedy trial claim, AEDPA limits our focus to the objective reasonableness of the result of the state court's balancing of the Barker factors under the facts in [petitioner]'s case.").  He therefore faces a formidable task, because, as the United States Fifth Circuit Court of Appeals has observed with respect to the "unreasonable application" prong of § 2254(d)(1):

> Section 2254(d)(1) imposes a "'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'"[FN9]  It is not enough for a petitioner to show that a state court's decision was incorrect or erroneous; he must show that the decision was objectively unreasonable, which is "a substantially higher threshold."[FN10] Very few petitioners can make this showing.[FN11]  "As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."[FN12] ...

> [FN9]  Cullen v. Pinholster, ___ U.S. ___, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011) (quoting Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam)).

> [FN10]  Schriro v. Landrigan, 550 U.S. 465, 473, 127 S.Ct. 1933, 167 L.Ed.2d 836 (2007); see also Lockyer

v. Andrade, 538 U.S. 63, 75-76, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

[FN11]  See Harrington v. Richter, ___ U.S. ____, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) ("It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable....  If this standard is difficult to meet, that is because it was meant to be.").

[FN12]  Id. at 786-87.

    ... This always-substantial deference is at an apex when we are reviewing a state court's application of a broad, general standard whose application "to a specific case can demand a substantial element of judgment."[FN14]  Determining whether a defendant's speedy-trial right has been violated requires the application of just such a standard.  As the Supreme Court explained in its seminal decision in Barker v. Wingo, the right to a speedy trial "is a more vague concept than other procedural rights," and it is "impossible to determine with precision when the right has been denied....  [A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case."[FN15]  Barker identified four factors that structure the inquiry into whether a defendant has been deprived of his right to a speedy trial:  "(1) the length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right to speedy trial, and (4) prejudice to the defendant."[FN16]  This four-factor balancing test eschews "rigid rules" and "mechanical factor-counting" in favor of "'a difficult and sensitive balancing process.'"[FN17]  Section 2254(d)(1) thus requires us to give the widest of latitude to a state court's conduct of its speedy-trial analysis.

    [FN14]  Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004).

    [FN15]  Barker v. Wingo, 407 U.S. 514, 521–22, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); see also Gray v. King, 724 F.2d 1199, 1202 (5th Cir. 1984) ("What is acceptable in one case ... may not be so in another; much depends on the complexity of the case.").

> [FN16]  Goodrum [v. Quarterman], 547 F.3d [249,]
> 257 [(5th Cir. 2008)] (citing Barker, 407 U.S. at 530,
> 92 S.Ct. 2182).
>
> [FN17]  Nelson v. Hargett, 989 F.2d 847, 851 (5th
> Cir. 1993) (quoting Barker, 407 U.S. at 533, 92 S.Ct.
> 2182).

Amos v. Thornton, 646 F.3d 199, 204-05 (5th Cir. 2011).[19]

       In light of these restrictive standards of review, the undersigned notes that much of

petitioner's argument in his reply to the state's response is simply misplaced.  For example, in that

reply, petitioner devotes considerable discussion to what he perceives to be errors in the state court's

discussion of the Barker factors.  However, it must be remembered that a state court's decision need

not be free of all errors in order to be accorded deference under the AEDPA.  On the contrary, as

the United States Fifth Circuit Court of Appeals has explained:

> [The AEDPA] compels federal courts to review for reasonableness
> the state court's *ultimate decision*, not every jot of its reasoning.  As

---

[19]  While these AEDPA standards of review are strict and narrow, they are purposely so.  As
the United States Supreme Court has explained:

> [Section 2254(d)] preserves authority to issue the writ in cases where
> there is no possibility fairminded jurists could disagree that the state
> court's decision conflicts with this Court's precedents. It goes no
> further.  Section 2254(d) reflects the view that habeas corpus is a
> guard against *extreme malfunctions* in the state criminal justice
> systems, *not a substitute for ordinary error correction through
> appeal*.

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added).  The
Supreme Court has also expressly warned that although "some federal judges find [28 U.S.C. §
2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply
the strictly deferential standards of review mandated therein.  White v. Woodall, 134 S. Ct. 1697,
1701 (2014).

the Second Circuit recently noted, even where a state court made a
mistake ..., "we are determining the reasonableness of the state court's
'decision,' ... not grading their papers."  Cruz v. Miller, 255 F.3d 77,
86 (2d Cir. 2001).

Santellan v. Cockrell, 271 F.3d 190, 193 (5th Cir. 2001) (emphasis added).  Therefore:

> [T]o facilitate our evaluation of the reasonableness of the state court's
> decision, we will conduct a limited review of the state court's analysis
> of each Barker factor.  We keep in mind, however, *the fact that the
> state court's preliminary conclusions regarding one or more of the
> factors, even if contrary to or objectively unreasonable in light of
> controlling Supreme Court precedent, are insufficient to grant
> habeas relief, so long as we find the ultimate decision reached by the
> state court not objectively unreasonable.*

Goodrum v. Quarterman, 547 F.3d 249, 257 (5th Cir. 2008) (emphasis added); accord Jackson v.

Ray, 390 F.3d 1254, 1266 (10th Cir. 2004) ("Because we focus on the [state court's] decision and

not its reasoning, the fact that the [state court] has made findings regarding the Barker factors that

are contrary to clearly established Supreme Court precedent is insufficient to grant habeas relief."

(citation omitted)).

With the foregoing limitations in mind, the Court will now consider the Barker

factors.  Regarding the first factor, the length of the delay, the United States Supreme Court has

explained:

> Simply to trigger a speedy trial analysis, an accused must allege that
> the interval between accusation and trial has crossed the threshold
> dividing ordinary from "presumptively prejudicial" delay, since, by
> definition, he cannot complain that the government has denied him
> a "speedy" trial if it has, in fact, prosecuted his case with customary
> promptness.  If the accused makes this showing, the court must then
> consider, as one factor among several, the extent to which the delay
> stretches beyond the bare minimum needed to trigger judicial
> examination of the claim.

Doggett v. United States, 505 U.S. 647, 651-52 (1992) (citation omitted).  The United States Fifth Circuit Court of Appeals has held:  "As the Supreme Court has observed, courts generally view a delay of approximately one year as sufficient to require a full Barker analysis.  This is the rule in the Fifth Circuit."  Goodrum, 547 F.3d at 257 (footnote omitted).

In the instant case, the Louisiana First Circuit Court of Appeal correctly found:  "In the present case, defendant's trial was commenced six years following the filing of the bill of information.  For purposes of this analysis, we will presume this delay, which was three times as long as the statutory delay, was presumptively prejudicial."[20]  Based on that finding, the Court of Appeal then continued, as it should, to consider the remaining three factors.

Regarding the second factor, the reason for the delay, the United States Supreme Court has held:

> Closely related to length of delay is the reason the government assigns to justify the delay.  Here, too, different weights should be assigned to different reasons. A deliberate attempt to delay the trial in order to hamper the defense should be weighted heavily against the government.   A more neutral reason such as negligence or overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant.  Finally, a valid reason, such as a missing witness, should serve to justify appropriate delay.

Barker, 407 U.S. at 531 (footnote omitted); accord Divers v. Cain, 698 F.3d 211, 218 (5th Cir. 2012) ("Any delays explained by valid reasons or attributable to the conduct of the defendant weigh in favor of the state." (quotation marks omitted)).

---

[20] Elzy, 2010 WL 1838321, at *7; State Rec., Vol. I of II.

In the instant case, the state courts apparently found this factor to be largely neutral, with the Louisiana First Circuit Court of Appeal explaining:

> In the present case, there appear to be multiple reasons for the delay following the filing of the bill of information and commencement of the trial. First, we note the parties were waiting on results from the State Police Crime Lab, and such results were delayed by the effects of Hurricane Katrina on the area.[FN6] Then, following the resolution of this obstacle, it appears the State negotiated a plea agreement with defendant's co-defendant, Spears. The information gleaned from Spears caused the State to file its intent to use other crimes evidence. Defendant sought to block use of such evidence and the litigation and review of the trial court's ruling, coupled with defendant's application for supervisory review from the trial court's denial of his motion to quash, were the major factors in causing the delay of this trial. Thus, although the delay was presumptively prejudicial, there were legitimate reasons for such delay.
>
> > [FN6] Another circuit has recognized that the effect of Hurricane Katrina on the criminal justice system was a circumstance beyond control of the State. See State v. Hamilton, 2007-0582, pp. 5-6 (La.App. 4 Cir. 11/28/07), 973 So.2d 110, 113-114 (regarding trial delays in Orleans Parish).[21]

In this federal proceeding, petitioner candidly concedes that not all delays in his prosecution were attributable to the state. For example, he notes that defense motions were being filed and considered from October 1, 2003, through March 8, 2005, and therefore concedes that this period should not be counted against the state.[22] He further concedes that the period of September 17, 2007, through September 19, 2008, likewise should not be counted against the state because that

---

[21] Elzy, 2010 WL 1838321, at *7; State Rec., Vol. I of II.

[22] Rec. Doc. 1, p. 6 n.1.

- 20 -

delay was attributable to litigation of the defense's motion to quash.[23]  However, he contends that, even when those periods are disregarded, more than three years and four months still elapsed during which he could have been, should have been, and wanted to be brought to trial.  He argues it is *that* extended delay, which he places at the feet of the state, that violated his right to a speedy trial.

In making that argument, petitioner contends that the Court of Appeal's foregoing analysis, which seemingly excused the state's delay as "legitimate," was riddled with factual errors and unfounded speculation.  For example, he argues that the Court of Appeal erroneously stated that "the parties agreed to continue trial of this matter from July 11, 2005 to September 12, 2005."[24]  As petitioner notes, this observation was in fact erroneous.  The defense actually objected to the continuance on the record.[25]

Petitioner next argues that, contrary to the Court of Appeal's findings, no delay was necessary for completion of the crime laboratory analysis.  He notes that his trial was set for September 17, 2005, and that he wanted to go forward on that date; however, the state requested and was granted a continuance.  Although the continuance was ostensibly requested in order to obtain the laboratory results, he argues that the laboratory had in fact completed its analysis in August and released its report on September 2, 2005, *prior* to the state seeking the continuance.[26]  He further

---

[23]  Rec. Doc. 1, p. 9.

[24]  <u>Elzy</u>, 2010 WL 1838321, at *5; State Rec., Vol. I of II.  The Court of Appeal made this statement in its discussion of petitioner's state law claim.

[25]  State Rec., Vol. I of II, transcript of July 11, 2005.

[26]  Rec. Doc. 14-1, p. 2.

argues that any other delays attributed by the court to Hurricane Katrina had no evidentiary

foundation in the record.  On these points, the following exchanges are reflected in the transcript of

a hearing on September 12, 2005:

> MS. PARKER [prosecutor]:
> And, Your Honor, I spoke with both counsel out in the hallway a few minutes ago and I informed them of the situation with the crime lab which, as I understand it, assuming they're telling me the truth, we had some miscommunications, we're merely waiting on the supervisor or a supervisor to sign off on the analysis, for the DNA analysis so that they can release the report to the state.  As the court is well aware, the state's position is that we do not wish to go forward with the trial without those results.  At this time we're asking that this matter be continued.
>
> MR. JORDAN [petitioner's counsel]:
> Your Honor, Gary Jordan appearing on behalf of Mr. Elzy who is present before the court.  We're ready for trial.  We would object to any continuance.  My client has also informed me that he is ready to go to trial without the crime lab, that he wishes to go to trial.
>
> THE COURT:
> Mr. Thiel.
>
> MR. THIEL [counsel for petitioner's co-defendant]:
> Just note our objection, Judge, for the record.
>
> THE COURT:
> Objection will be noted for the record.  Continuance will be granted.  Gentlemen, since we are having a major problem in the state with Katrina, most of our local officers, I know people from Baton Rouge have all been pulled in to try and assist with the emergency down in New Orleans.  I'm not quite certain with some of the other matters we've been trying to get information on exactly when we will be able to obtain that information. ...[27]

---

[27]  State Rec., Vol. I of II, transcript of September 12, 2005.

However, even if, as petitioner argues, the crime laboratory analysis had in fact already been completed and forwarded to the state, there is no suggestion that the prosecutor lied or acted in bad faith in order to obtain the continuance; rather, it appears she was simply unaware of that fact, which would constitute negligence at worst.[28]  And while the state court's observation that the criminal justice system was floundering a mere two weeks after Hurricane Katrina may have been anecdotal rather than based on evidence in the record, the undersigned cannot say the observation was unwarranted or otherwise suspect.  Therefore, the Court finds petitioner's arguments on these points unpersuasive.

Third, petitioner appears to suggest that, contrary to the Court of Appeal's opinion, the defense did *not* challenge the use of the "other crimes" evidence and, therefore, he shares no responsibility for delays resulting from the state's desire to use such evidence.  If so, he is incorrect. Petitioner's trial was set for July 10, 2006.  At a hearing on June 27, 2006, the state announced that it intended to file a motion to allow for the admission of such evidence.  Defense counsel stated that he wanted a hearing on any such motion, and he requested an August hearing date rather than the July date suggested by the prosecution.[29]  Accordingly, the defense did in fact object to the use of such evidence and, due to the defense demand for a hearing on the matter, the trial had to be

---

[28]  Out of an abundance of caution, the Court further notes that petitioner argues at length that the DNA results were unnecessary because they would not prove that a rape had in fact occurred. That, obviously, is true.  However, the results were nevertheless relevant, in that they could, and ultimately did, show that Spears and the victim had sexual intercourse as the victim alleged. Therefore, to the extent that petitioner is suggesting that the prosecutor's desire to have the results was unwarranted or in any way indicative that she was acting in bad faith in seeking to delay the trial in order to obtain the results, the undersigned rejects that suggestion.

[29]  State Rec., Vol. I of II, transcript of June 27, 2006.

continued.  Further, defense counsel then requested discovery with respect to the "other crimes" evidence, which necessitated further delays, including a joint request for a continuation on September 27, 2006, at which time the *defense* requested a November hearing date on the "other crimes" motion.[30]

When the foregoing points are considered, the undersigned finds that, although the Court of Appeal's decision was not error-free, it was accurate for the most part.  And, in any event, the Court of Appeal's resulting decision that the second factor was largely neutral is neither incorrect nor unreasonable for the following reasons.  First, there is no evidence whatsoever that the state deliberately attempted to delay the trial in order to hamper the defense.  Second, while the state court found that the delays attributable to the crime laboratory report were legitimate and justified delay, this Court's analysis would not be significantly altered even if that state court finding is considered erroneous.  As already noted, the confusion over the laboratory report resulted from negligence at worst, and, although such negligence generally weighs in a petitioner's favor, it does not do so significantly.  <u>See, e.g.</u>, <u>Cowart v. Hargett</u>, 16 F.3d 642, 647 (5th Cir. 1994) ("Unexplained or negligent delay is weighed against the state, but not heavily.").  And, third, the delays occasioned by defense efforts to litigate the admissibility of the "other crimes" evidence weighs in the state's favor.  <u>See id</u>. ("Where the state advances valid reasons for the delay, or the delay is attributable to acts of the defendant, this factor is weighed in favor of the state.").  On balance, therefore, the second <u>Barker</u> factor is indeed neutral in this case.

---

[30]  State Rec., Vol. I of II, transcript of September 27, 2006.

Regarding <u>Barker</u>'s third factor, a petitioner's assertion of his right to speedy trial, the

United States Supreme Court has explained:

> Whether and how a defendant asserts his right is closely related to the other factors we have mentioned. The strength of his efforts will be affected by the length of the delay, to some extent by the reason for the delay, and most particularly by the personal prejudice, which is not always readily identifiable, that he experiences. The more serious the deprivation, the more likely a defendant is to complain. The defendant's assertion of his speedy trial right, then, is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right. We emphasize that failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.

<u>Barker</u>, 407 U.S. at 532-32.

With respect to this third factor, the Louisiana First Circuit Court of Appeal found:

> The third factor to be considered when analyzing a defendant's speedy trial claim is whether the defendant asserted this right to a speedy trial. The <u>Barker</u> balancing test allows a court to weigh the frequency and force of the objections as opposed to attaching significant weight to a purely pro forma objection. The failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial.
>
> In the present case, there were numerous objections by the defendant to the State's motions for continuance. However, the minute entries and record clearly reflect at the time defendant filed his motion to quash, there were outstanding motions regarding use of other crimes evidence that he had filed. Moreover, once the trial court ruled on defendant's motion to quash, there was considerable, yet understandable, delay following defendant's attempts to seek supervisory review of that ruling. Finally, although defendant objected to the State's motions for continuance prior to filing his motion to quash, there were several times following the trial court's ruling on the admission of other crimes evidence that defendant sought and obtained continuances so he could seek supervisory review of that ruling. Given the fact defendant had outstanding

motions and his own actions in seeking continuances, we find his objections to the delays are not entitled to significant weight.[31]

This Court could perhaps quibble with the weight assigned to this factor by the state court.  As the state court noted, petitioner often asserted his right to a speedy trial.  That is significant, because, as the United States Fifth Circuit Court of Appeals has observed:

> Barker instructs that "[t]he defendant's assertion of his speedy trial right ... is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."  This is because the vigorousness with which a defendant complains about the delay will often correspond to the seriousness of the deprivation.  Moreover, one justification articulated in Barker for adopting a flexible balancing test is the ability of courts to vary the weight assigned to a defendant's invocation of the right depending on its frequency and forcefulness.  Accordingly, we have applied these clearly articulated principles from Barker and construed vigorous and timely assertions of the right to speedy trial as weighing strongly or heavily in the defendant's favor.

Goodrum v. Quarterman, 547 F.3d 249, 259 (5th Cir. 2008) (footnotes omitted).  Although it was perhaps not unreasonable in the instant case for the state court to discount petitioner's repeated assertions of his right to a speedy trial to some degree based on his desire for delays at other times, it is nevertheless arguably appropriate to accord this factor additional weight in petitioner's favor in light of the prolonged periods during which he repeatedly asked to be brought to trial.

Regarding the fourth factor, resulting prejudice, the United States Supreme Court explained:

> Prejudice ... should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect.  This Court has identified three such interests: (i) to prevent oppressive

---

[31] Elzy, 2010 WL 1838321, at *8 (citation omitted); State Rec., Vol. I of II.

> pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired. Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious. There is also prejudice if defense witnesses are unable to recall accurately events of the distant past. Loss of memory, however, is not always reflected in the record because what has been forgotten can rarely be shown.

Barker, 407 U.S. at 532 (footnote omitted).

In the instant case, the state courts found this factor weighed against petitioner, with the Louisiana First Circuit Court of Appeal explaining:

> The final factor to be considered when analyzing a defendant's speedy trial claim under Barker is the prejudice to the defendant resulting from the delay. Prejudice to the defendant should be analyzed in light of the following interests that the right to a speedy trial was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize anxiety and concern of the accused; and (3) to limit the possibility that the defense will be impaired.
>
> In the present case, defendant was out on bail for a large portion of the six-year period. Moreover, there are numerous minute entries reflecting defendant was not even present for a hearing date, although his appearance was waived by his counsel. Thus, such instances raise serious questions regarding the anxiety and concern suffered by defendant. Finally, there is no indication that the defense was impaired whatsoever by this delay, despite defendant's assertions in brief regarding how he was personally affected by the delay.
>
> Considering the foregoing, we find there has been no showing that defendant's constitutional right to a speedy trial was unfairly prejudiced by this delay. [32]

Petitioner appears to be arguing that the there is an internal inconsistency within the state court's opinion, because the court found that the delay in petitioner's case was presumptively

---

[32] Elzy, 2010 WL 1838321, at *8 (citation omitted); State Rec., Vol. I of II.

prejudicial at the first prong of the <u>Barker</u> analysis but then also found at the fourth prong that petitioner suffered no *actual* prejudice.[33]  If that is indeed petitioner's argument, it misses the mark because a finding of "presumptive prejudice" at the first prong does not carry the weighty meaning petitioner appears to suggest.  Rather, as the United States Supreme Court has explained:  "[A]s the term is used in this threshold context, 'presumptive prejudice' does not necessarily indicate a statistical probability of prejudice; it simply marks the point at which courts deem the delay unreasonable enough to trigger the <u>Barker</u> enquiry."  <u>Doggett v. United States</u>, 505 U.S. 647, 652 n.1 (1992).

That said, it is clear that, in some cases, a delay is so protracted and the reasons for the delay so egregious that a petitioner need not show actual prejudice at the fourth prong.  In fact, that was the case in <u>Doggett</u>, in which the Supreme Court explained:

> [T]he Government claims Doggett has failed to make any affirmative showing that the delay weakened his ability to raise specific defenses, elicit specific testimony, or produce specific items of evidence. Though Doggett did indeed come up short in this respect, the Government's argument takes it only so far:  consideration of prejudice is not limited to the specifically demonstrable, and, as it concedes, *affirmative proof of particularized prejudice is not essential to every speedy trial claim.*  <u>Barker</u> explicitly recognized that impairment of one's defense is the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony can rarely be shown.  And though time can tilt the case against either side, one cannot generally be sure which of them it has prejudiced more severely.  Thus, we generally have to recognize that excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove or, for that matter, identify.  *While such presumptive prejudice cannot alone carry a Sixth Amendment claim without regard to the other <u>Barker</u>*

---

[33]  <u>See</u> Rec. Doc. 14, pp. 1-2.

> *criteria, it is part of the mix of relevant facts, and its importance*
> *increases with the length of delay.*

Id. at 655-56 (citations and quotation marks omitted; emphasis added).  The Supreme Court then

discussed the role presumptive prejudice should play at the fourth prong of the Barker analysis by

examining hypothetical situations.  The United States Fifth Circuit Court of Appeals has concisely

summarized that discussion as follows:

> The Court in Doggett provided three hypotheticals to illustrate the
> role of presumptive prejudice.
> 　　The Court described three situations in which a defendant
> would have to show varying degrees of prejudice.  The defendant's
> degree of proof in each situation varies inversely with the
> government's degree of culpability for the delay.  Thus, in the first
> case, where the government was reasonably diligent in its efforts to
> bring the defendant to trial, the defendant must show specific
> prejudice to his defense.  This is so, according to the Court, no matter
> how great the delay.  On the other hand, if the defendant can show
> that the government intentionally held back its prosecution in order
> to gain an impermissible tactical advantage, then the defendant would
> present an overwhelming case for dismissal.
> 　　"Official negligence" occupies the "middle ground,"
> according to the Court.  When the government's conduct is neither
> diligent nor malicious but simply negligent, the court must perform
> yet another balancing to determine the weight to be accorded such
> negligence.  This balancing requires the court to determine what
> portion of the delay is attributable to the government's negligence and
> whether this negligent delay is of such a duration that prejudice to the
> defendant should be presumed.  The weight given to the government's
> negligence varies directly with its protractedness and its consequent
> threat to the fairness of the accused's trial.

Robinson v. Whitley, 2 F.3d 562, 570 (5th Cir. 1993) (citations and quotation marks omitted).

Ultimately, the Supreme Court found in Doggett that "the Government's egregious

persistence in failing to prosecute Doggett" was sufficient to warrant relief *without* an affirmative

showing of prejudice.  The Court reasoned:

> The lag between Doggett's indictment and arrest was 8 ½ years, and he would have faced trial 6 years earlier than he did but for the Government's inexcusable oversights. The portion of the delay attributable to the Government's negligence far exceeds the threshold needed to state a speedy trial claim; indeed, we have called shorter delays extraordinary. *When the Government's negligence thus causes delay six times as long as that generally sufficient to trigger judicial review, and when the presumption of prejudice, albeit unspecified, is neither extenuated, as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief.*

<u>Doggett</u>, 505 U.S. at 657-58 (citations, footnotes, and quotation marks omitted; emphasis added).

Here, as already noted, petitioner concedes that not all of the delays in his case are attributable to the government; on the contrary, he notes that only approximately three years and four months of the delay should be counted against the state.[34] The undersigned therefore finds that petitioner is clearly incorrect to the extent he is arguing that clearly established federal law relieved him of the affirmative obligation to make a particularized showing of actual prejudice.   On the contrary, the clearly established federal law, i.e. <u>Doggett</u>, provides only that a petitioner is relieved of that obligation if the delay attributable to the state is six years or longer.  As the United States Tenth Circuit Court of Appeals explained in <u>Jackson v. Ray</u>, 390 F.3d 1254 (10th Cir. 2004):

> In cases of extreme delay, criminal defendants need not present specific evidence of prejudice.  Instead, they may rely on the presumption of prejudice created by the delay.  <u>Doggett</u>, 505 U.S. at 655, 112 S.Ct. 2686.  Here, Mr. Jackson argues that the state's culpability for, and the length of, the four and one-third-year delay places this case within the ambit of the <u>Doggett</u> rule.  We disagree.
> In <u>Doggett</u>, the Court held that a delay of eight and one-half years, of which the government was responsible for approximately six years, relieved the defendant of the need to make a particularized showing of prejudice.  <u>Id</u>. at 657, 112 S.Ct. 2686.  The Court held

---

[34]  Rec. Doc. 1, p. 9.

> that "[w]hen the Government's negligence thus causes delay six times
> as long as that generally sufficient to trigger judicial review [i.e., six
> years], and when the presumption of prejudice, albeit unspecified, is
> neither extenuated as by the defendant's acquiescence, nor
> persuasively rebutted, the defendant is entitled to relief." <u>Id.</u> at 658,
> 112 S.Ct. 2686. *Here, because the delay is less than six years,*
> *clearly established Supreme Court law does not require application*
> *of the <u>Doggett</u> rule.*

<u>Jackson</u>, 390 F.3d at 1263-64.

Further, to the extent that petitioner is arguing that the state court's finding that he

failed to show actual prejudice is an unreasonable application of clearly established federal law, that

argument likewise fails. In the instant case, petitioner has made no showing whatsoever that his

ability to present a defense was in any way impaired by the delay. For example, he has not

identified any witnesses who were unavailable (or whose memories were dimmed) as a result of the

delay or any evidence that was rendered unavailable. Although prejudice can also take other forms,

such as oppressive pretrial incarceration or anxiety and concern on the part of the accused, the state

court found that petitioner had failed to establish those forms of prejudice as well. For example, the

state court noted that petitioner was out on bail for much of the time, and the undersigned notes that

petitioner does not argue that any period during which he was detained was "oppressive." In any

event, the United States Fifth Circuit Court of Appeals requires a particularized showing in support

of a claim of oppressive pretrial detention. For example, in <u>United States v. Frye</u>, 489 F.3d 201 (5th

Cir. 2007), the Fifth Circuit held:

> Frye's argument that he suffered oppressive pretrial incarceration is
> conclusory and not supported by evidence specifying harm. A
> lengthy pretrial incarceration does not inherently offend a defendant's
> liberty interests. <u>See, e.g.</u>, <u>Gray v. King</u>, 724 F.2d 1199, 1204 (5th
> Cir. 1984) (finding no oppressive pretrial incarceration where
> defendant received credit for pretrial incarceration to be applied his

> sentence).  Frye was ultimately sentenced to life in prison without the possibility of release.  Therefore, Frye, like the defendant in <u>Gray</u>, did not suffer any increase in his total time spent in prison as the result of pretrial delays.  Because Frye has not identified anything otherwise oppressive about the pretrial incarceration, Frye cannot establish that the pretrial incarceration created prejudice.

<u>Frye</u>, 489 F.3d at 213.  Likewise, petitioner presented no evidence of undue anxiety or concern, and it is clear that "generalized expressions of anxiety and concern amount to little more than a nominal showing of prejudice."  <u>Goodrum v. Quarterman</u>, 547 F.3d 249, 263 (5th Cir. 2008); <u>accord</u> <u>Leachman v. Stephens</u>, 581 Fed. App'x 390, 405 (5th Cir. 2014) ("The trial court transcript reveals only Leachman's own assertions of stress and anxiety and no corroborating evidence of those assertions.  This factor thus does not favor Leachman."), <u>cert. denied</u>, No. 14-8765, 2015 WL 1055911 (U.S. May 18, 2015).

For all of the foregoing reasons, the undersigned finds that the state court correctly found that petitioner failed to make a particularized showing of prejudice and that the fourth <u>Barker</u> factor therefore favors the state.

In summary, in order to prevail in this federal proceeding, petitioner must show  that the state court's decision rejecting his federal speedy trial claim was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Therefore, "[h]abeas relief is only available if there is no possible balancing of the factors that both supports the [state court's] ultimate decision and is not contrary to clearly established Supreme Court precedent."  <u>Jackson v. Ray</u>, 390 F.3d 1254, 1266-67 (10th Cir. 2004).  That is not the case here.  The state courts found the first <u>Barker</u> factor to weigh in petitioner's favor, the second factor to be largely neutral, and the fourth factor to weigh in the

state's favor.  For the reasons already explained, those findings were consistent with federal law.

Although perhaps the state courts should have weighed the third factor more heavily in petitioner's

favor, that, as already explained, is not determinative.  Even if that factor is moved more firmly into

petitioner's column, the results of the <u>Barker</u> analysis is still decidedly mixed.  Faced with such

mixed results under a <u>Barker</u> analysis, the state court's "ultimate decision" finding no federal speedy

trial violation simply is not an unreasonable application of clearly established federal law.  <u>See, e.g.,</u>

<u>Goodrum v. Quarterman</u>, 547 F.3d 249 (5th Cir. 2008) (relief denied where the first and third factors

weighed heavily in petitioner's favor, the second factor weighed slightly in his favor, and the fourth

factor weighed in the state's favor); <u>see also</u> <u>Amos v. Thornton</u>, 646 F.3d 199 (5th Cir. 2011) (relief

denied where the first and second factors weighed slightly in petitioner's favor, the third factor

weighed strongly in his favor, and the fourth factor weighed in the state's favor).  Accordingly, under

the AEDPA's deferential standard of review, petitioner's claim should be denied.

## **<u>RECOMMENDATION</u>**

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus*

relief filed by Robert Henry Elzy, Jr., be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and

recommendation in a magistrate judge's report and recommendation within fourteen (14) days after

being served with a copy shall bar that party, except upon grounds of plain error, from attacking on

appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district

court, provided that the party has been served with notice that such consequences will result from

a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[35]

New Orleans, Louisiana, this twenty-second day of June, 2015.

**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[35] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.